580 A.2d 820

COMMONWEALTH of Pennsylvania, Appellee,

v.

James E. VANDERLIN, Jr., Appellant (Two Cases).

Superior Court of Pennsylvania.

Submitted June 11, 1990.

Filed Sept. 18, 1990.

David Crowley, Asst. Public Defender, Mercer, for appellant.

Ray F. Gricar, Dist. Atty., Bellefonte, for the Com., appellee.

Before CAVANAUGH, BECK and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from a judgment of sentence entered in the Court of Common Pleas of Centre County. We affirm.

The record indicates that on November 27, 1988, at approximately 5:00 p.m., J.Q. was attacked and sexually assaulted. J.Q. was walking home from work when she noticed a dark-haired man of average build and of average height heading in her direction. (N.T., May 24, 1989, at 17, 30–31). Shortly thereafter, J.Q. was attacked. The perpetrator put his arm around J.Q.'s neck from behind and told her that he wanted to see her breasts. *Id.* He then unbuttoned her blouse, tore open her bra, and took off her pants and her underpants. *Id.* at 18. J.Q. testified that her attacker pulled her down to her knees and fondled her. *Id.* She stated that he kissed her all over her body and that his hands were "stuck up in my vagina and . . . on my breasts

and stomach." *Id.* at 19. *See also id.* at 21–22. J.Q. only glanced at her attacker's face because he covered her eyes with her work apron. *Id.* at 18.

The perpetrator removed his clothing and told J.Q. to fondle him. She refused. He wanted J.Q. to engage in oral sex but she again refused. The attacker then offered J.Q. a choice: "he was either going to take all my clothes from me, he was going to rape me or kill me." *Id.* at 19. *See also id.* at 22. In response, J.Q. fondled the attacker. *Id.* at 20. She testified that she thought he ejaculated. *Id.* The perpetrator threatened J.Q. during the attack. She believed that he was going to kill her. *Id.*

J.Q. testified that the assailant kissed her on the mouth and that she could tell that he was a smoker. *Id.* She also said that she felt his beard on her chest and that he wore glasses. *Id.* at 21.[1] J.Q. repeatedly testified that she remembered her assailant's voice. She said that he spoke to her in a "scratchy whisper" throughout the twenty minute assault. *Id.* at 21.

Although J.Q. refused to engage in oral sex with her attacker, he put his penis on her mouth so that they were touching. *Id.* at 21–22, 39–40. The perpetrator kissed and fondled J.Q. some more "and when he went to leave [he] rolled me back onto my stomach and told me not to look up or he was going to kill me." *Id.* at 22. The attacker then fled. J.Q. walked home and reported the incident to her mother and to the police.

At approximately 7:00 p.m. on November 27, 1988, the appellant, James Vanderlin, dialed "911" and reached the Centre County Emergency Communications Center. The dispatcher traced Vanderlin's call to an apartment complex located in proximity to the crime scene. *Id.* at 55–56. The call was automatically recorded. *Id.* at 49–50. During his conversation with the dispatcher, Vanderlin asked whether

---

1. The record indicates that the appellant, James Vanderlin, had a beard, wore glasses and was a heavy smoker. N.T., May 24, 1989, testimony of Investigator Thomas Jordan, at 86–7. *See also id.* at 65 (police officer details the description of J.Q.'s attacker based on the report received from J.Q.).

an attempted rape had occurred near the high school track. When the dispatcher replied that he had not yet received such a report, Vanderlin confessed to the commission of the crime. *See id.* at 52–55.

Investigator Thomas Jordan obtained a copy of the tape recording and played it to J.Q. two times. *Id.* at 27, 81–83. J.Q. identified the voice as that of her attacker. *Id.* at 81–83. Thereafter, Jordan played the tape over the radio and television. Several persons contacted Jordan and identified the caller's voice as Vanderlin's.[2] *Id.* at 83–85.

On January 20, 1989, Vanderlin was arrested and charged with Criminal Attempt (Rape), Criminal Attempt (Involuntary Deviate Sexual Intercourse), Indecent Assault, Indecent Exposure, Unlawful Restraint and False Imprisonment. On March 23, 1989, Vanderlin filed a motion to suppress the identification testimony of the victim, which was denied. He also filed motions in limine, which were denied. Following a jury trial, Vanderlin was convicted of all charges. His post-verdict motions were denied. Vanderlin was sentenced to an incarceration period of seven to fifteen years for Attempted Rape and a consecutive period of three to ten years for Attempted Involuntary Deviate Sexual Intercourse. Vanderlin filed a motion to modify his sentence for Attempted Rape. Realizing that the sentence initially imposed for Attempted Rape was illegal, the trial judge re-sentenced Vanderlin to five to ten years for Attempted Rape and a consecutive term of five to ten years

---

**2.** At trial, Vanderlin stipulated that it was he who placed the call to 911. *See also* N.T., May 24, 1989, at 116, 129, 132 (Vanderlin admitted dialing 911); *id.* at 148–49 (investigator's testimony). He testified on his own behalf. Vanderlin stated that he witnessed the attack on J.Q. *Id.* at 113–15. He described the assailant as a dark-haired, bearded man. *Id.* at 113–14, 135. Vanderlin testified that he was depressed over a recent break-up with his fiance and that he had been contemplating suicide. *Id.* at 110–11. He did not want his ex-fiance to feel responsible for his death, so he decided to confess falsely to the attack upon J.Q. in a phone call to the police so that he would have reason to follow through on his suicide attempt. *Id.* at 115–17. He did not actually attempt suicide; nor did he re-dial 911 to clear his name. *Id.* at 120, 138.

for Attempted Involuntary Deviate Sexual Intercourse.[3] Vanderlin filed another motion to modify sentence, which was denied. This appeal followed.

Vanderlin has preserved the following issues for our review:

I. Whether the trial court erred in failing to suppress the one-on-one identification of the attacker's voice from a tape recorded purported confession.

II. Whether the evidence was insufficient to establish that defendant took a substantial step toward the completion of the crime of attempted rape.

III. Whether the guilty verdict for attempted rape was against the weight of the evidence as the evidence did not preponderate that defendant took a substantial step toward the completion of the crime of attempted rape.

IV. Whether the trial court erred in not merging the offenses of attempted rape and attempted involuntary deviate sexual intercourse for sentencing purposes.

V. Whether the trial court erred and violated defendant's protections against double jeopardy under the United States and Pennsylvania Constitutions by sua sponte modifying the judgment of sentence passed upon him in open court four days previously and increasing his minimum period of incarceration for the offense of attempted involuntary deviate sexual intercourse.

*See* Appellant's brief, at 4. We will address each issue seriatim.

■ Vanderlin's first contention is that the trial court erred in failing to suppress J.Q.'s testimony identifying the voice on the tape recorded message as that of her attacker.

---

3. At the "re-sentencing" hearing, October 27, 1989, the trial court stated: "there has not been anything filed by Mr. Crowley asking for sentence modification that I'm aware of. If you filed it, then I guess I haven't seen it." *Id.* at 4; *see id.* at 2–5. The court continued: "So the Court's belief here is that what it is doing, as opposed to vacating a sentence and then deciding to resentence, is that it is correcting a mistake that was made, admittedly several days ago, but doing it at its first opportunity." *Id.* at 4. Apparently, the trial court altered Vanderlin's sentence not in response to Vanderlin's request for modification, but because the trial court realized its own error.

Vanderlin asserts that the method employed by Investigator Jordan to procure the identification testimony from J.Q. was unnecessarily suggestive and unreliable under the "totality of the circumstances" test. Vanderlin claims that his case was prejudiced by the admission of the identification testimony. We disagree.

At the onset, we note our standard of review in considering an appeal from the denial of a motion to suppress. Our role "is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Fromal*, 392 Pa.Super. 100, 111, 572 A.2d 711, 717 (1990); *Commonwealth v. Reddix*, 355 Pa.Super. 514, 518, 513 A.2d 1041, 1042 (1986). In making this determination,

> we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. (Citation omitted). Moreover, when the evidence viewed in this manner supports the factual finding of the suppression court this Honorable Court can reverse only if there is an error in the legal conclusion drawn from those factual findings.

*Reddix*, 355 Pa.Super. at 518, 513 A.2d at 1042; *Commonwealth v. Cauto*, 369 Pa.Super. 381, 535 A.2d 602 (1987) (this Court may reverse the suppression court only if its legal conclusions, drawn from the facts in the record, are erroneous).

The instant case represents a somewhat novel situation, and case law dealing with voice identification from a tape recorded message is sparse. However, we have reviewed the analogous case law and conclude that the trial court did not err in allowing J.Q.'s identification testimony.

The parties adequately cite the pertinent law; both Vanderlin and the Commonwealth correctly refer to *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) for the proposition that the reliability of an identification is the linch pin in determining whether the identifica-

tion testimony is admissible. Courts must look to the totality of the circumstances to determine whether an identification is reliable. *Id.* at 114, 97 S.Ct. at 2253.[4]

As both the Pennsylvania Supreme Court and this Court have recognized, the suggestiveness of police tactics in the identification process is one factor to consider in determining whether to admit identification evidence, but suggestiveness alone will not necessarily cause the evidence to be excluded. *See Commonwealth v. Ransome*, 485 Pa. 490, 495, 402 A.2d 1379, 1382 (1979) ("Suggestiveness alone does not warrant exclusion. Instead '[i]t is the likelihood of misidentification which violates a defendant's right to due process, and it is this which [is] the basis of the exclusion of evidence.' " (citations omitted)); *Commonwealth v. Johnson*, 301 Pa.Super. 13, 446 A.2d 1311 (1982) (accord), *aff'd in part, vacated in part* 499 Pa. 380, 453 A.2d 922 (1982). The United States Supreme Court has stated that a pre-trial identification will not be suppressed unless it can be shown that the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *see Commonwealth v. Johnson*, 301 Pa.Super. 13, 15, 446 A.2d 1311, 1312 (1982).

In the instant case, the trial court relied on *Commonwealth v. Thompkins*, 311 Pa.Super. 357, 457 A.2d 925 (1983). In *Thompkins*, this Court applied the "totality of

4. The United States Supreme Court stated in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):

We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall confrontations. The factors to be considered are set out in *Biggers.* [*Niel v. Biggers* ] 409 US [188] at 199–200, 34 LEd2d 401, 93 SCt 375 [at 382 (1972) ]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* at 114, 97 S.Ct. at 2253.

the circumstances" test and considered the *Manson* factors in determining the reliability of an identification. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

The *Thompkins* Court stated:

The essential criteria in determining whether or not evidence of pre-trial identification is admissible is its *reliability* under all of the circumstances disclosed by the record. The question for the suppression court is whether the challenged identification has sufficient indicia of reliability to warrant its admission even though the confrontation procedure may have been suggestive. [Footnote omitted] [Citation omitted].

*Id.* 311 Pa.Super. at 362–63, 457 A.2d at 928.

We are satisfied that the trial court in the instant case properly evaluated Vanderlin's claim. It adhered to the standards enunciated in *Manson* and adopted in *Thompkins* and correctly concluded to deny Vanderlin's motion to suppress. We echo the following language and reasoning of the trial court.

At the Preliminary Hearing, the Commonwealth played a tape recording of a telephone call received by "911" on November 27, 1988—the date the alleged offenses took place. The caller first asked the police dispatcher whether an attempted rape near the high school track had been reported. When the dispatcher replied he did not have any news release on anything of that nature, the caller replied, "Well, it was me and I think I'm going to kill myself." (N.T., p. 14)

The victim in this matter has identified the voice on the tape as belonging to her assailant. The first identification took place on December 8, 1988, when Investigator Jordan took the tape to the victim's house. According to the victim's testimony at the suppression hearing, Investigator Jordan told her he had a tape for her to listen to and he wanted to know whether or not the voice belonged to the man who attacked her. Investigator Jordan played the tape twice. The first time through, the victim testi-

fied she "froze" because she recognized the voice on the tape. After Investigator Jordan play [sic] the tape a second time, the victim testified she reacted by saying, "Yes, that's definitely him."

The Commonwealth played this tape at the Preliminary Hearing and the suppression hearing, the victim again identifying the voice as that of her assailant each time. Defendant urges that the first identification of the voice on tape on December 8, 1988, was impermissibly suggestive because the tape contained only one voice. Defendant contends the identification is therefore akin to a photographic lineup with only one photograph. Defendant further maintains that because every subsequent identification of the voice by the victim was tainted by this first impermissibly suggestive identification, all such subsequent identifications must be suppressed. This would also render inadmissible any potential identification at trial of the voice on the tape.

While Defendant's analogy to a photographic lineup with only one photograph is well taken, we nevertheless do not believe it requires suppression of the tape or the identification. In *Commonwealth v. Thompkins*, 311 Pa.Super. 357, 457 A.2d 925 (1983), the Pennsylvania Superior Court discussed the factors to be considered in making such a determination. Noting that "(t)he essential criteria in determining whether or not evidence of pre-trial identification is admissible is its reliability under all of the circumstances," the Court wrote: 'The question for the suppression court is whether the challenged identification has sufficient indicia of reliability to warrant its admission even though the confrontation procedure may have been suggestive.' 311 Pa.Super. at 362–363, 457 A.2d at 928 (emphasis in original) [sic] (footnote and citation omitted).

The Court in *Thompkins* then enumerated certain factors which should be considered in deciding whether or not to suppress evidence of pre-trial identifications. They are: '... the opportunity of the witness to view the criminal at

the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Id.* (Citing *Manson v. Brathwaite,* 432 U.S. 98, 114 [97 S.Ct. 2243, 2253, 53 L.Ed.2d 140] (1977).) In *Commonwealth v. Spiegel,* 311 Pa.Super. 135, 145, 457 A.2d 531, 536 (1983), the Superior Court went one step further, holding that the opportunity of the witness to view the actor at the time of the crime is the key factor in the totality of the circumstances analysis (citation omitted).

In the case at hand, the Court has before it an audio pre-trial identification, rather than the usual identification of an eyewitness or visual nature. Nevertheless, the Superior Court's opinions in *Thompkins* and *Spiegel,* above, are relevant and instructive inasmuch as the same principles must be applied.

The victim in the instant case had ample opportunity to listen to her assailant at the time of the alleged crime. She testified that the attack lasted approximately twenty minutes. Additionally, she testified the assailant spoke to her continuously throughout the attack, directing her to do certain things. The evidence clearly established not only that she had ample opportunity to listen to the sound of his voice, but also that her attention was focused on what the assailant was saying to her throughout the attack.

Another factor to be considered, according to *Thompkins,* is the level of certainty which the victim demonstrated when confronted with the tape recording. We note again the victim's testimony that she "froze" when she first heard the recording, and after asking Investigator Jordan to play it once again "so she could be sure," the victim stated unequivocally that it was the voice of her attacker. We must also consider the amount of time which elapsed between the crime and the confrontation. The attack

allegedly took place on November 27, 1988. The victim first identified the voice on the tape on December 8, 1988, eleven days later. It is difficult to know just how long is "too long" between a crime and an identification. Nonetheless, this Court does not believe eleven days to be too long a lapse between the alleged attack and the victim's identification of the attacker's voice.

The remaining factor to be considered, under *Thompkins,* is the accuracy of the victim's prior description of the criminal. It is not clear from the record whether the victim ever gave the police a description of her attacker's voice prior to the identification on December 8, 1988. Nevertheless, in view of the application of all the other *Thompkins* factors to the instant case, we believe the victim's identification has "sufficient indicia of reliability to warrant its admission even though the confrontation procedure may have been suggestive." *Thompkins,* 311 Pa.Super. at 363, 457 A.2d at 928 (footnote and citation omitted). We also subscribe to the Superior Court's assertion in *Commonwealth v. Spiegel, supra,* that the opportunity of the witness to view, or in this case *hear,* the actor at the time of the crime is the key factor in the "totality of the circumstances" analysis.

Against all of the above factors, this Court must now weight the "corrupting effect of the suggestive identification itself." *Thompkins, supra.* We do not find the corrupting effect of admitting the voice identification is of such weight as to render it inadmissible. The challenged evidence merely connects an anonymous caller with the crime. Alone, it does not connect *Defendant* with the crime. That fact, coupled with what we believe are sufficient indicia of reliability surrounding the voice identification, leads us to enter the following ... [Order denying Vanderlin's motion to suppress identification testimony was entered on April 21, 1989].

Trial Court's opinion and order, Omnibus pre-trial motion, April 21, 1989, at 2–7. After an independent review of the

record and pertinent case law, we hold that the trial court properly denied Vanderlin's motion to suppress.[5]

▮ Vanderlin next asserts that judgment should have been arrested with respect to the charge of Criminal Attempt (Rape) because the evidence was insufficient to sustain his conviction. We find this claim to be without merit. The law is clear that in reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict winner, and drawing all reasonable inferences therefrom, we determine whether there is sufficient evidence to establish each element of the crime beyond a reasonable doubt. *Commonwealth v. Griscavage*, 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986); *Commonwealth v. Hunter*, 381 Pa.Super. 606, 610, 554 A.2d 550, 551 (1989). In applying this test, we must evaluate the entire trial record and consider all evidence actually received. *Griscavage*, 512 Pa. at 543, 517 A.2d at 1257.

In the instant case, Vanderlin claims that since there was no attempted sexual intercourse, the evidence was insufficient to sustain his guilty verdict for attempted rape. The criminal attempt statute in Pennsylvania provides that "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). *See Commonwealth v. Russell*, 313 Pa.Super. 534, 542–43, 460 A.2d 316, 320–21 (1983) (discusses intent to commit rape and sufficiency of the evidence); *Commonwealth v. Gilliam*, 273 Pa.Super. 586, 589–90, 417 A.2d 1203, 1205 (1980) (discusses the "substantial step" test). Regarding the crime of rape, two statutes are relevant to our discussion. 18 Pa.C.S. § 3121 defines rape as follows.

**5.** We note that although Vanderlin attempted to suppress J.Q.'s identification testimony, he did not challenge the Commonwealth's evidence that the voice on the tape belonged to him. After J.Q. identified the voice as that of her assailant, several persons, exposed to the tape through radio and television, identified the voice as Vanderlin's. Vanderlin did not contest any of this latter evidence. Conversely, Vanderlin stipulated that the voice on the tape was his. He testified at trial that he placed the call to 911; but he denied committing the crimes.

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent.

18 Pa.C.S. § 3101 defines sexual intercourse as follows. "In addition to its ordinary meaning, [sexual intercourse] includes intercourse per os or per anus, with some penetration however slight; emission is not required."

In the instant case, the record provides sufficient evidence to indicate that an attempted rape occurred. J.Q.'s assailant removed her blouse, ripped open her bra, pulled off her pants and underpants, fondled her body, kissed her, inserted his finger into her vagina, threatened to rape her or kill her, told her that he wanted oral sex and in fact touched her mouth with his penis. The case law in this State strongly supports the trial court's finding that there was ample evidence to sustain an attempted rape conviction. *See Commonwealth v. Owens,* 315 Pa.Super. 400, 462 A.2d 255 (1983) (conviction for attempted rape upheld where defendant hit a seven year old child, forced her into a garage, removed her clothes and unzipped his pants before a neighbor interceded by entering the garage); *Commonwealth v. Simpson,* 316 Pa.Super. 115, 462 A.2d 821 (1983) (defendant's actions in applying pressure to victim's throat and in loosening and starting to take off his pants constituted a substantial step towards the commission of rape; conviction for attempted rape sustained); *Commonwealth v. Russell,* 313 Pa.Super. 534, 460 A.2d 316 (1983) (evidence was sufficient to sustain conviction for attempted rape where defendant cut the victim's tee shirt, bra, jeans and panties, and fondled her breasts and placed his finger in her vagina); *Commonwealth v. Martin,* 307 Pa.Super. 118, 452 A.2d 1066 (1982) (substantial step in effectuating an intend-

ed rape occurred where defendant grabbed victim, threatened her, and expressed intent to have sex with her); *Commonwealth v. Keeler*, 302 Pa.Super. 324, 448 A.2d 1064 (1982) (defendant pushed victim to the ground and told her he was going to rape her; victim scratched defendant; this Court held that presence of scratch marks on defendant's neck was sufficient to sustain attempted rape conviction); *Commonwealth v. Moody*, 295 Pa.Super. 106, 441 A.2d 371 (1982) (attempted rape conviction upheld where defendant forced a twelve year old girl into his basement, fondled her genitalia and began to unzip his pants before she escaped); *Commonwealth v. King*, 290 Pa.Super. 563, 434 A.2d 1294 (1981) (attempted rape conviction upheld where defendant exposed himself to victim, indicated that he wanted to have sex with her, approached her and forcibly laid down on top of her); *Commonwealth v. Bullock*, 259 Pa.Super. 467, 393 A.2d 921 (1978) (evidence was sufficient to sustain charge of attempted rape where defendant pulled at victim's blouse, pulled down her bra and tried to remove her pants).

Vanderlin also argues that his guilty verdict was contrary to the weight of the evidence. We also find this claim to be without merit. In *Commonwealth v. Hunter*, 381 Pa.Super. 606, 554 A.2d 550 (1989), this Court reiterated the test to be applied when an appellant asserts that his conviction is against the weight of the evidence.

The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. Before a trial court may award a new trial on this ground, it must appear that the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative. When the challenge to the weight of the evidence is predicated on the credibility of the trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence "is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture,"

... these types of claims are not cognizable on appellate review.

*Hunter,* 381 Pa.Super. at 617, 554 A.2d at 555 (citations omitted). In applying these standards to the instant case, we conclude that the jury's verdict was not so contrary to the evidence as to shock one's sense of justice. The record amply supports the jury's finding of guilt in this case.[6]

█ Vanderlin's next allegation of error is that the trial court failed to merge the offenses of attempted rape and attempted involuntary deviate sexual intercourse for sentencing purposes. Since Vanderlin attempted to commit two separate crimes, we find no error in the trial court's ruling.

18 Pa.C.S. § 3123, Pennsylvania's Involuntary Deviate Sexual Intercourse statute, provides:

A person commits a felony of the first degree when he engages in deviate sexual intercourse with another person:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious;

(4) who is so mentally deranged or deficient that such person is incapable of consent; or

(5) who is less than 16 years of age.

Moreover, 18 Pa.C.S. § 3101 defines deviate sexual intercourse as "[s]exual intercourse per os or per anus between

6. We note that the fact finder is in the best position to determine the credibility of the witnesses and to assess the weight of the evidence. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984); *see also Commonwealth v. Parker,* 387 Pa.Super. 415, 422, 564 A.2d 246, 248 (1989) (an appellate court will not engage in a reevaluation of a witness' testimony found credible by the finder of fact). In the instant case, the jury heard testimony from the victim and from Vanderlin himself, in addition to the other witnesses. The jury was free to believe all, part or none of the evidence presented at trial. *Commonwealth v. Jensch,* 322 Pa.Super. 304, 315, 469 A.2d 632, 638 (1983). We will not disturb the jury's verdict in this case, as it was substantiated by the evidence.

human beings who are not husband and wife, . . . and any form of sexual intercourse with an animal."

As previously stated, 18 Pa.C.S. § 3101 also defines sexual intercourse. The definition of sexual intercourse is relevant to the attempted rape charge. The applicable part of the statute reads: "In addition to its ordinary meaning, [sexual intercourse] includes intercourse per os or per anus with some penetration however slight; emission is not required." *Id.*

In the instant case, Vanderlin disrobed J.Q. and forced her to fondle him. Additionally, he touched her mouth with his penis. Thus, the jury could conclude that Vanderlin attempted involuntary deviate sexual intercourse.

Vanderlin, after undressing J.Q., told her of his intentions to rape or kill her, inserted his finger into her vagina, fondled her and kissed her all over her body. Thus, the jury could conclude that Vanderlin attempted rape. We do not find error in the trial court's conclusion that two distinct offenses occurred.[7] Therefore, these crimes do not merge for sentencing purposes. *See Commonwealth v. Williams,* 521 Pa. 556, 559 A.2d 25 (1989) (discusses the doctrine of merger and lesser included offenses); *Commonwealth v. Kubiac,* 379 Pa.Super. 402, 416–17, 550 A.2d 219, 226–27 (1988) (discusses whether separate statutory offenses merge for sentencing purposes); *Commonwealth v.*

---

7. In *Commonwealth v. Hitchcock,* 523 Pa. 248, 565 A.2d 1159 (1989), the Pennsylvania Supreme Court distinguished rape from involuntary deviate sexual intercourse and sanctioned separate punishments for each. It stated:

> The purpose of the statutes [applicable to rape and involuntary deviate sexual intercourse] is to protect against forcible sexual penetration of the three orifices of the body by making it a crime to do any or all to a victim. The forcible sexual penetration of another person is not a free choice of the type or method of penetration desired by the perpetrator. If the perpetrator does more than one on the same occasion then the perpetrator violates different protections and different interests of the victim for which separate penalties follow. Where the victim is a woman she may be injured by three different penetrations on the same occasion. Where each is separately charged, as here, [footnote omitted] each may be separately punished. [Citations omitted].

*Id.* 523 Pa. at 251, 565 A.2d at 1161.

*McCusker*, 363 Pa. 450, 457–58, 70 A.2d 273, 277 (1950) (defines and explains the doctrine of merger). *See also Commonwealth v. Hitchcock*, 523 Pa. 248, 565 A.2d 1159 (1989) (merger of forcible rape and statutory rape into involuntary deviate sexual intercourse for sentencing purposes was error, where offenses were discrete and distinct); *Commonwealth v. Pifer*, 284 Pa.Super. 170, 425 A.2d 757 (1981) (compares rape statute with involuntary deviate sexual intercourse statute); *Commonwealth v. Buser*, 277 Pa. Super. 451, 457, 419 A.2d 1233, 1236 (1980) ("[t]he question whether one crime merges into another crime for the purposes of imposing sentence must be answered by reference to the facts presented in the individual case"); *Commonwealth v. Johnson*, 274 Pa.Super. 440, 418 A.2d 487 (1980) (sentences for Rape and Involuntary Deviate Sexual Intercourse did not merge); *Commonwealth v. Ludwig*, 366 Pa.Super. 361, 363 n. 6, 531 A.2d 459, 460 n. 6 (1987) (accord) *appeal granted* 518 Pa. 617, 541 A.2d 744 (1988).

 Vanderlin finally argues that the trial court erred and violated his protections against double jeopardy by sua sponte modifying his judgment of sentence and by increasing his minimum period of incarceration for attempted involuntary deviate sexual intercourse. Four days after orally announcing sentence, the trial judge lessened Vanderlin's incarceration period for attempted rape and increased his term of imprisonment for attempted involuntary deviate sexual intercourse.[8] Vanderlin contends that an increased modification of sentence violates the double jeopardy clause. After a review of the current case law, we disagree.

Although our research has revealed no case which directly confronts this issue, we find analogous case law to be

8. Vanderlin was initially sentenced to an incarceration period of seven to fifteen years for attempted rape, to run consecutively with an incarceration period of three to ten years for attempted involuntary deviate sexual intercourse. The trial court then modified punishment. As a result, Vanderlin was "re-sentenced" to five to ten years for attempted rape and five to ten years for attempted involuntary deviate sexual intercourse, consecutive.

instructive. In *Commonwealth v. Jones*, 520 Pa. 385, 554 A.2d 50 (1989), the Pennsylvania Supreme Court overruled *Commonwealth v. Brown*, 455 Pa. 274, 314 A.2d 506 (1974) and held that a sentencing court could sua sponte increase a sentence that was illegally imposed, without violating the prohibitions against double jeopardy. In *Jones*, the sentencing court corrected its error after the defendant began serving his sentence.[9]

In discussing the right to appeal the legality of a sentence, our Supreme Court stated, "it has long been the opinion of a dissenting segment of this Court that an illegal sentence is a legal nullity, and sentencing courts must have the authority to correct such a sentence even if that means increasing the sentence." *Jones*, 520 Pa. at 390, 554 A.2d at 52. Thereafter, the *Jones* Court concluded that the trial court's modification of the defendant's illegal sentence was proper, even though the modification resulted in an increased maximum period of incarceration. *Id.* *See also Commonwealth v. Greer*, 382 Pa.Super. 127, 141, 554 A.2d 980, 987 (1989) (enhanced sentence reflected original intent of sentencing court and "merely [gave] effect to the original sentencing scheme"); *Commonwealth v. Broadie*, 339 Pa.Super. 394, 489 A.2d 218 (1985) (double jeopardy clause does not prohibit sentencing court from modifying a defendant's sentence and from increasing the punishment).[10]

In *Commonwealth v. Green*, 232 Pa.Super. 555, 335 A.2d 392 (1975), this Court rejected the appellant's argument that

9. The difference between *Jones* and the instant case is that in *Jones,* the sentencing court changed only the illegal sentence; whereas here, the trial court modified both sentences, even though Vanderlin only challenged the illegally imposed sentence for attempted rape. Again, we note that the trial court did not have the benefit of Vanderlin's motion to modify sentence when it took action to remedy its initial error.

10. We also find persuasive *Commonwealth v. Grispino*, 361 Pa.Super. 107, 521 A.2d 950 (1987). In *Grispino*, this Court held that a sentencing court could increase a defendant's sentence, without violating double jeopardy principles, "in order to maintain a sentence close to [defendant's] original sentence." *Id.* 361 Pa.Super. at 112, 521 A.2d at 953; *see also Commonwealth v. Goldhammer*, 512 Pa. 587, 517 A.2d 1280 (1986).

his protections against double jeopardy were violated when he was twice sentenced for the same crime. In that case, the defendant's sentence was modified within two hours of its original imposition because the trial judge realized that the sentence initially imposed was illegal. The judge modified the defendant's sentence to conform with the Controlled Substance, Drug, Device and Cosmetic Act.[11] In holding that the appellant was properly sentenced, this Court stated, "[w]e believe that appellant's claim must fail because of a fallacy in its initial premise: that a *first sentence* of five years was imposed prior to the imposition of the five to twenty year term." *Id.*, 232 Pa.Superior Ct. at 557, 335 A.2d at 393.

The *Green* Court relied on a number of federal cases to support its position that

a sentence, like any other judgment, is to be construed so as to give effect to the intention of the sentencing judge and that to determine this intention the court will limit itself to the language of the judgment despite oral statements of the sentencing judge which are not incorporated in it.

*Id., citing United States ex rel. Speaks v. Brierley,* 417 F.2d 597, 600 (3d Cir.1969). We note that in the instant case, the trial court clearly expressed its intention that Vanderlin remain imprisoned for ten to twenty five years. Trial Court opinion, November 22, 1989, at 6, 8. The trial court realized that it had made a sentencing error before the sentencing orders had been reduced to writing, signed and filed with the Prothonotary. The court became aware of its mistake at the end of the day following the "first" sentencing. *See id.* at 2. It contacted the parties and reconvened to rectify the sentencing error at the next earliest opportunity.

In *Bozza v. United States,* 330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947), the United States Supreme Court stated:

11. As in the instant case, Green's "first" sentence was not recorded on the indictment.

The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner. In this case the court 'only set aside what it had no authority to do, and substitute[d] directions required by the law to be done upon the conviction of the offender.' It did not twice put petitioner in jeopardy for the same offense.

*Id.* (citations omitted); *see also Commonwealth v. Foster,* 229 Pa.Super. 269, 324 A.2d 538 (1974), *citing Hill v. United States ex rel. Wampler,* 298 U.S. 460, 56 S.Ct. 760, 80 L.Ed. 1283 (1935) ("[t]he only sentence known to the law is the sentence or judgment entered upon the records of the court"). *See Commonwealth v. Unger,* 315 Pa.Super. 408, 462 A.2d 259 (1983) (trial judge's oral statements not incorporated into the written and signed judgment of sentence are not part of the judgment of sentence; oral pronouncement of sentence does not constitute an imposed sentence for double jeopardy purposes).

Vanderlin argues that he only requested modification of his sentence for attempted rape. He claims that the trial court did not have the proper authority to modify the attempted deviate sexual intercourse sentence sua sponte. We disagree. First, we are persuaded by the Commonwealth's interpretation of *Commonwealth v. Lezinsky,* 264 Pa.Super. 476, 400 A.2d 184 (1979). *See also* Trial Court opinion, November 22, 1989, at 7–8.[12] In *Lezinsky,* this Court vacated three sentences imposed by the trial court,

12. We note that a portion of *Commonwealth v. Lezinsky,* 264 Pa.Super. 476, 400 A.2d 184 (1979) was overruled by *In Interest of Rodriguez,* 371 Pa.Super. 130, 537 A.2d 854 (1988). In *Rodriguez,* this Court clarified the scope of its decision by stating:

Appellant argues, based on *Commonwealth v. Lezinsky,* 264 Pa.Super. 476, 400 A.2d 184 (1979) and *Commonwealth v. Williams,* 299 Pa.Super. 278, 445 A.2d 753 (1982) that tangible property is limited to personal property and does not include real property. He contends that the wall of a building does not qualify as tangible property. We find tangible property, as that phrase is used in the criminal mischief statute, includes both real and personal property. To the extent that *Lezinsky* and *Williams* find to the contrary, they are expressly overruled.

*Id.,* 371 Pa.Super. 130, at 132–33, 537 A.2d at 855.

even though it found only two of the sentences to be erroneous. We held:

> The Judgment of Sentence on the Criminal Mischief charge must be vacated. In this situation, where we cannot determine whether the declared invalidity of a conviction on one count may have affected the lower court's sentencing on the remaining counts, we must remand to give the lower court an opportunity to reconsider sentencing. [Citations omitted].

> For the reasons stated above, the conviction on the criminal mischief charge is vacated, as are the sentences on the remaining charges, and the case is·remanded to the lower court for resentencing.

*Id.* 264 Pa.Super. at 480, 400 A.2d at 186. We agree with the Commonwealth that "the principle behind the *Lezinsky* decision is that if a trial court errs in its sentence for one count in a multi-count case, then all sentences for all counts will be vacated so that the court can re-structure its entire sentencing scheme." Appellee's brief, at 19. The Commonwealth posits that "[t]his is in recognition of the fact that probably the court would have sentenced the defendant differently had it known that one of its sentences was illegal." *Id.*

Second, as noted previously, the trial court in the instant case had not received Vanderlin's motion for modification at the time it imposed the "second" sentence. Therefore, we will address Vanderlin's challenge to the trial court's authority to change a sentence sua sponte. Specifically, Vanderlin contests the trial court's decision to increase his sentence.[13] Pa.R.Crim.P. 1410 provides, "[a] motion to mod-

---

13. Vanderlin refers us to the dissenting opinion in *Commonwealth v. Gallagher,* 296 Pa.Super. 382, 442 A.2d 820 (1982) (dissent, Popovich, J.). Therein, this writer opposed the trial court's whimsical modification of the defendant's sentence. However, Judge Popovich recognized that "[o]f course, a court may modify a sentence in a proper case." *Id.,* 296 Pa.Superior Ct. at 391, 442 A.2d at 824. The judge cited *Commonwealth v. Riggins,* 474 Pa. 115, 126, 377 A.2d 140, 146 (1977) for the proposition that where a sentence has been increased, "the factual data upon which the increased data [sic] is based must be made [a] part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal." *Id.* We have carefully scrutinized the instant record and we find that the trial court

ify sentence shall be in writing and shall be filed with the sentencing court within ten (10) days after imposition of sentence." The official comment thereafter reads

This rule provides a procedure whereby a motion to modify sentence must be raised in the first instance before the sentencing court, thereby giving that court the first opportunity to modify the sentence. If the case proceeds to an appellate court, the Rule 1405 requirement that the trial judge state on the record the reasons for imposing a sentence will provide a record concerning the sentence. However, *this procedure does not affect the court's inherent power to correct an illegal sentence, or obvious and patent mistakes in its orders, at any time.* [Citation omitted] [Emphasis added].

In the instant case, the trial court's initial error was that it imposed an illegal sentence. The trial court had the inherent power to correct its mistake and further, to effectuate its intent that Vanderlin remain in jail for up to twenty years. *See* N.T., Sentencing Proceeding, October 23, 1989, at 16–18; Resentencing Proceeding, October 27, 1989, at 14–17.[14]

fully explained his reasons for modifying Vanderlin's sentence. *See* N.T., Resentencing Hearing, October 27, 1989, at 2–4. We also reject Vanderlin's reliance on *Commonwealth v. Silverman,* 442 Pa. 211, 275 A.2d 308 (1971), which held that a modified sentence that increased a defendant's punishment violated the double jeopardy clause. Although *Silverman* is a Pennsylvania Supreme Court decision, it pre-dated the adoption of Pa.R.Crim.P. 1410.

**14.** Moreover, the trial court was clear, both in its determination that Vanderlin had committed distinct and separate crimes, and in its directive that his two punishments should run consecutively. N.T., Resentencing Proceeding, October 27, 1989, at 7–14.

It is axiomatic that sentencing decisions are within the sound discretion of the trial court. *Commonwealth v. Stalnaker,* 376 Pa.Super. 181, 545 A.2d 886 (1988). In *Commonwealth v. Golden,* 309 Pa.Super. 286, 289, 455 A.2d 162, 163 (1983), we noted that the trial court is in the better position to evaluate the various factors involved in sentencing. Accordingly, we defer to the trial court's decisions absent an abuse of discretion. *Id.; see also Commonwealth v. Smith,* 369 Pa.Super. 1, 5–6, 534 A.2d 836, 838 (1987); *Commonwealth v. Meo,* 362 Pa.Super. 328, 332, 524 A.2d 902, 904 (1987).

Finally, in *Commonwealth v. Rainey*, 338 Pa.Super. 560, 488 A.2d 34 (1985), this Court held that "double jeopardy principles do not prevent a sentencing court from correcting, modifying, or increasing a sentence which the same court previously imposed." *Id.*, 338 Pa.Superior Ct. at 562–63, 488 A.2d at 35; *see also Commonwealth v. Anderson*, 304 Pa.Super. 476, 481, 450 A.2d 1011, 1014 (1982) (the double jeopardy clause does not preclude review and subsequent increase of sentences).

For the foregoing reasons, we find that the trial court properly remedied its error without depriving Vanderlin of his constitutional rights. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

BECK, J., concurs in the result.